**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN**

---

**UNITED STATES OF AMERICA**
   **Plaintiff,**

 v.              **Case No. 17-CR-162**

**CHAVIS JOHNSON**
   **Defendant.**

---

## DECISION AND ORDER

Defendant Chavis Johnson moves to modify his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A). For the reasons that follow, I deny his motion.

### I. FACTS AND BACKGROUND

On July 29, 2019, defendant pleaded guilty to felon in possession of a firearm. Pursuant to the plea agreement, the government agreed to recommend no more than 78 months in prison, the defense no less than 30, both below the advisory sentencing guideline range of 100-120 months.

The facts of the case are as follows: on June 30, 2017, at around 11:33 p.m., Milwaukee police responded to a 911 call of "shots fired" in the 4100 block of North 19th Street. The officers pulled up next to a vehicle parked on the block to ask the occupants if they heard any shots; they also illuminated the vehicle's interior with the squad's spot light to see who was in the vehicle and if anyone was injured. The officers observed a driver and a front passenger, later identified as defendant. Defendant looked at the officers, turned away from them, opened the passenger door, got out of the vehicle, and began to walk swiftly away from the vehicle towards a residence. He appeared to be holding his right side in a manner consistent with the

carrying of an un-holstered firearm. The officers ordered defendant to stop, but he instead continued moving toward the house. The officers detained him on the porch, recovering a loaded .40 caliber pistol with an obliterated serial number from his right front pants pocket.

Defendant was barred from possessing a firearm due to his prior felony convictions for possession with intent to deliver marijuana, possession with intent to deliver cocaine, and bail jumping. He was also subject to a valid state domestic violence injunction issued on April 24, 2015.

Defendant was initially charged in state court and released on bond, but he missed a hearing in September 2017, resulting in the issuance of a bench warrant. He was not apprehended until April 2019, and in the meantime a federal grand jury had handed up an indictment. The state charges were dismissed based on the federal indictment, and he was ordered detained in this matter.

On February 21, 2020, I sentenced defendant to 30 months in prison. Defendant took no appeal, but on April 24, 2020, he filed the instant motion asking the court to reduce his prison sentence to time served and convert the remaining time to home confinement. He has not yet been designated to a BOP facility and remains confined locally at the Waukesha County Jail. The BOP has calculated his release date as May 28, 2021.

## II. DISCUSSION

**A.    Compassionate Release Standards**

Motions for "compassionate release" are authorized by 18 U.S.C. § 3582(c)(1), which provides, in pertinent part:

> The court may not modify a term of imprisonment once it has been imposed except that—

2

> (1) in any case—
>
> > (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
> >
> > > (i) extraordinary and compelling reasons warrant such a reduction;
> > > . . .
> >
> > and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c).

The parties agree that because defendant has not been designated to a BOP facility he cannot ask the warden for compassionate release or otherwise pursue administrative remedies with the agency. (R. 49 at 8-10; R. 49-2; R. 52 at 7 n.1.) Accordingly, the statute's "exhaustion" requirement is not barrier to relief.[1]

However, defendant still must demonstrate "extraordinary and compelling reasons" in order to obtain a modification. Congress did not define that term in the statute, instead delegating the matter to the Sentencing Commission. See 28 U.S.C. § 994(t).

The Commission's policy statement provides:

Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a

---

[1] I recently concluded that this requirement is not jurisdictional and may in some cases be waived or excused in order to reach the merits. See United States v. Scott, No. 17-CR-156, 2020 U.S. Dist. LEXIS 85554, at *9-16 (E.D. Wis. May 15, 2020). The government agrees that this case should be decided on the merits.

3

term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—

(1)　(A) extraordinary and compelling reasons warrant the reduction . . .

(2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3) the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13. The commentary to the policy statement provides that extraordinary and compelling reasons exist under these circumstances:

> (A) Medical Condition of the Defendant.—
>
>> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>>
>> (ii) The defendant is—
>>
>>> (I) suffering from a serious physical or medical condition,
>>>
>>> (II) suffering from a serious functional or cognitive impairment, or
>>>
>>> (III) experiencing deteriorating physical or mental health because of the aging process,
>>
>> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
>
> (C) Family Circumstances.—
>
>> (i) The death or incapacitation of the caregiver of the defendant's minor

4

> child or minor children.
>
> (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.
>
> (D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13 cmt. n.1.

The Commission has not updated the policy statement, which purports to require a motion from the director of the Bureau of Prisons, see U.S.S.G. § 1B1.13 cmt. n.4, since December 2018, when Congress amended § 3582(c)(1) to permit defense motions. See United States v. Garcia, No. 4:05-cr-40098, 2020 U.S. Dist. LEXIS 75335, at *6-7 (C.D. Ill. Apr. 28, 2020) (noting that the Commission has been unable to act due to the lack of a quorum). In Scott, I adopted what appears to be the majority position—that the court in deciding a compassionate release motion is no longer confined to the specific examples enumerated in the policy statement. 2020 U.S. Dist. LEXIS 85554, at *17-18. Giving the statutory terms their ordinary meaning, a defendant seeking compassionate release would need to demonstrate that his situation is extraordinary, i.e., beyond what is usual, customary, regular, or common, and his need for release compelling, i.e., irreparable harm or injustice will result if relief is not granted. Id. at *20; see also United States v. Ramirez, No. 17-10328-WGY, 2020 U.S. Dist. LEXIS 83363, at *6 (D. Mass. May 12, 2020) ("The policy contained in section 1B1.13 serves as helpful guidance on the factors that support compassionate release, although it is not ultimately conclusive.") (internal quote marks omitted); United States v. Pinto-Thomaz, No. 18-cr-579, 2020 U.S. Dist. LEXIS 64444, at *4-5 (S.D.N.Y. Apr. 13, 2020) (holding that the court

5

may grant compassionate release motions on grounds that are distinct from, but of similar magnitude and importance to, those specifically enumerated in application note 1 to U.S.S.G. § 1B1.13).

Finally, if the court decides that extraordinary and compelling reasons have been shown, it must also consider the applicable § 3553(a) factors to determine whether the sentence should be modified. Those factors include: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for the sentence imposed to provide just punishment, deterrence, protection of the public, and correctional treatment; (3) the kinds of sentences available; (4) the sentencing guideline range; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to the victims of the offense. 18 U.S.C. § 3553(a). In some cases, a court may find that the relevant § 3553(a) factors outweigh the extraordinary and compelling reasons warranting compassionate release and/or that compassionate release would undermine the goals of the original sentence. See, e.g., United States v. Daugerdas, No. 09cr581, 2020 U.S. Dist. LEXIS 77658, at *9 (S.D.N.Y. May 1, 2020); see also U.S.S.G. § 1B1.13(2) (stating that the court must determine the defendant would not pose "a danger to the safety of any other person or to the community" if released).

**B.     Defendant's Motion**

    **1.     Extraordinary and Compelling Reasons**

Defendant relies on the danger posed by the COVID-19 pandemic. He notes that while he awaits designation the virus has spread throughout BOP facilities (R. 49 at 3-4); that over-crowded and under-funded correctional institutions are not equipped to handle these outbreaks

(R. 49 at 5); that persons in such facilities are at greater risk for illness (R. 49 at 14, 17-18); and that reduction of the prison population is a key factor in reducing the overall death rate from COVID-19 (R. 49 at 6).

While the risks posed by the COVID-19 pandemic are relevant in deciding a compassionate release motion, "reliance on circumstances applicable to everyone in prison would appear to read the term 'extraordinary' out of the statute." Scott, 2020 U.S. Dist. LEXIS 85554, at *22. Consistent with this construction, courts have tended to deny compassionate release motions based on general concerns about possible exposure to COVID-19, id. (citing United States v. Gold, No. 15 CR 330, 2020 U.S. Dist. LEXIS 79539, at *5 (N.D. Ill. May 6, 2020) (collecting cases)), granting relief to prisoners particularly vulnerable to the virus. Id. (citing Ramirez, 2020 U.S. Dist. LEXIS 83363, at *9 (collecting cases)).[2]

Defendant contends that he is vulnerable based on a number of factors, but his argument is unpersuasive. He notes that he is 39 years old, approaching 40, an age when the rate of complications from COVID-19 is higher than for children or young adults. (R. 49 at 15; R. 53 at 7-8.) Given his current release date, defendant will—assuming he receives more than a few weeks of halfway house time—be released from prison before he turns 40. Moreover,

---

[2]Each case must, of course, be decided on its own facts. Some courts have considered the circumstances at the particular facility where the prisoner is confined. E.g., Scott, 2020 U.S. Dist. LEXIS 85554, at *22 n.9. Defendant notes that one inmate and one staff member at the Waukesha County Jail, where he is detained, have tested positive. (R. 49 at 2-3.) In its response, the government notes that it appears officials at the Waukesha facility have been able to contain the problem. (R. 52 at 7.) In reply, defendant notes that the BOP does not appear to have the problem under control. (R. 53 at 4-5.) He also notes the recent outbreak at the Kenosha jail, another U.S. Marshal contract facility. (R. 53 at 6.) However, he does not dispute the government's contention regarding the Waukesha jail where he is detained. (R. 53 at 5.)

7

the CDC has designated those 65 and older as high-risk for severe illness from COVID-19.[3]

Defendant further notes that at just over 6 feet tall, he weighs nearly 230 pounds, making him borderline obese, and obese persons, perhaps due to chronic inflammation, are at greater risk. (R. 49 at 15; R. 53 at 7.) The PSR lists defendant's height as 6'1" and his weight as 225 pounds. (R. 48 at 14 ¶ 59.) Those figures produce a BMI (body mass index) of 29.7, making him overweight but not obese.[4] As the government notes, defendant's BMI is close to the average for American men.[5] (R. 52 at 6.) Defendant indicates that obesity often accompanies other chronic illnesses (R. 49 at 15), but he makes no claim that he suffers from any such ailments. Indeed, the PSR, completed just a few months ago, states: "The defendant reported no history of chronic illnesses or medical conditions requiring treatment. He also denied any allergies to food or medication." (R. 48 at 14 ¶ 60.) In his motion, defendant concedes that he is not currently receiving treatment for any medical condition. (R. 49 at 14.)

Defendant next indicates that he smoked for years—marijuana daily when he was younger and cigarettes as an adult—leaving him at higher risk. (R. 49 at 15-16; R. 53 at 7.) The PSR states: "Mr. Johnson smoked marijuana for the first time at age 15. He reported smoking marijuana daily between ages 16 and 22. Prior to his arrest, the defendant reported smoking one joint every other week." (R. 48 at 15 ¶ 66.) Defendant does not explain how this level of use contributes to his specific risk and, as the government notes, a majority of prison inmates admit some past use of marijuana. (R. 52 at 13.) Defendant cites no evidence

---

[3]See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

[4]See https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm.

[5]See https://www.cdc.gov/nchs/fastats/body-measurements.htm.

8

regarding the length and extent of his cigarette smoking, making it difficult to assess his specific risk for respiratory complications; he acknowledges that he has been in custody for over a year and is not currently smoking. (R. 49 at 15-16.)

Finally, defendant notes that he is an African-American male; the virus has hit the African-American community particularly hard and is killing men at a higher rate than women. (R. 49 at 16-17; R. 53 at 7.) While some have suggested that genetic factors might explain these differences, defendant concedes that the reasons remain unknown.[6] (R. 53 at 7.) In any event, defendant's race and sex do not make his situation extraordinary and compelling as compared to other inmates.

For all of these reasons, I find that defendant has failed to establish extraordinary and compelling reasons supporting release. For the reasons that follow, I also find that the § 3553(a) factors support maintaining the current sentence.

**2.    Section 3553(a) Factors**

The nature of the underlying offense is set forth above. (See R. 48 at 4 ¶¶ 11-14.) As defendant notes, he was not at the time engaging in other criminal activity, and there is no

---

[6]See United States v. Alexander, No.: 19-32 (FLW), 2020 U.S. Dist. LEXIS 85609, at *8 (D.N.J. May 15, 2020) ("As an initial matter, it is not clear that being African-American increases Defendant's risk of complications from the COVID-19, in the same manner as one's underlying medical conditions. Indeed, although African Americans are overrepresented in data regarding COVID-19 hospitalizations and deaths in America as a whole, this overrepresentation may result from other systemic economic and social issues affecting the African American community, including access to health care, higher prevalence of underlying conditions, and lack of access to health insurance."); Carlos M. D. v. Anderson, No. 2:20-cv-3908 (BRM), 2020 U.S. Dist. LEXIS 84854, at *22 (D.N.J. May 14, 2020) ("Petitioner has not established the link between what may be a pre-existing racial disparity in this country and how it would impact his ability to prevent infection or suffer from the severe effects if he is infected with COVID-19. Additionally, to date, the CDC has not designated members of any particular ethnic and/or racial group to be particularly prone to the adverse effects of COVID-19.").

indication that he fired the shots to which the police responded. (R. 53 at 11, 15.) In his pre-sentencing memorandum, defendant indicated that he possessed the gun for protection. It was unclear why he felt the need to carry his gun sitting in a car talking to a friend near his residence. He indicated that he believed a drug dealer lived down the street, but he did not provide specifics on why he would need to go armed because of that. (See R. 40 at 2, 6.)

As for defendant's history and characteristics, the PSR detailed a fairly significant prior record. In 2000, defendant was sentenced to 12 months in jail for possession with intent to deliver THC. (R. 48 at 7 ¶ 34.) In 2003, he was sentenced to 2 years in prison followed by 2 years of extended supervision for possession with intent to deliver cocaine and bail jumping (offenses he committed in 2001), with a revocation on these cases in 2007. (R. 48 at 8, 9 ¶¶ 35, 37.) The bail jumping apparently arose out of a missed court date while he was in custody in Oklahoma in 2001 for "Transportation of Proceeds Derived from a Violation of the UCDSA," for which sentence was deferred for 3 years except the first 60 days. In that case, police stopped a car in which defendant was a passenger, noticed a strong odor of marijuana, and recovered marijuana and a loaded 9mm semi-automatic pistol, drug paraphernalia, and currency inside the vehicle. (R. 48 at 8 ¶ 36.) In 2005, defendant was convicted of drunk driving. (R. 48 at 9 ¶ 38.) In 2010, he was convicted of disorderly conduct arising out of an altercation with his then girlfriend, for which he served 90 days in jail after revocation of his probation. (R. 48 at 9-10 ¶ 39.) Also in 2010, he was sentenced to 9 months in jail for possession with intent-THC. (R. 48 at 10 ¶ 40.) In 2013, he was convicted of another drunk driving offense, for which he served 12 days. (R. 48 at 10 ¶ 41.) Finally, in 2015, he was sentenced to 18 months' probation with 30 days jail for criminal damage to property and disorderly conduct arising out of an incident involving the same victim as the 2010 disorderly

case. He was able to complete that supervision term without revocation, although the PSR stated that he struggled with sobriety, was unable to maintain employment, and absconded. (R. 48 at 11-12 ¶ 42.)

Defendant reported a fairly normal childhood, raised by his mother and older sister. (R. 48 at 13 ¶ 52.) He had been in a relationship for several years, and his girlfriend remained supportive, as did his mother, sister, and girlfriend's mother. (R. 48 at 13-14; R. 40-1, 40-2; R. 41-1.) He had two children, then ages 17 and 15, from a previous relationship. He reported being an involved parent, but he did owe nearly $30,000 in support arrears. (R. 48 at 14 ¶ 55.) Prior to his arrest, he was living with his girlfriend and her son. (R. 48 at 14 ¶ 58.)

As to his correctional needs, the record suggested an issue with drinking to excess (R. 48 at 15 ¶ 65); defendant also admitted past use of marijuana and cocaine (R. 48 at 15 ¶¶ 66-67). He completed a six month substance abuse treatment program in 2015, while on state supervision, yet he continued to submit drug tests positive for cocaine. (R. 48 at 15 ¶ 69.)

Defendant was able to graduate high school (R. 48 at 15 ¶ 71; R. 40 at 4-5), and he completed some additional vocational training, including a technical degree in welding (R. 48 at 15-16 ¶¶ 72-73). From 2012 to 2016, he worked as a welder, with previous employment as a painter. (R. 48 at 16.) As he forthrightly admitted in his pre-sentencing memorandum, however, as an adult he had been "frustratingly inconsistent" in maintaining employment and otherwise staying out of trouble. (R. 40 at 5.)

As indicated, the guidelines recommended 100-120 months, with a statutory range of 0-10 years. (R. 48 at 17 ¶¶ 86-87.) At the original sentencing hearing, I agreed with the parties that, while some prison time was needed, the guideline range was greater than necessary.

First, the record contained no indication of use, attempted use, or threatened use of the

11

gun. While the police responded to a shots fired complaint, there was no evidence that defendant fired his gun. Nor was there any indication that he was engaging in other criminal activity, such as drug trafficking, at the time. While I was unimpressed with the "protection" rationale, the case did seem mitigated in its particulars, such that lengthy prison was not needed to provide just punishment.

The guidelines viewed this as an aggravated case, setting the base offense level at 24 (R. 48 at 6 ¶ 22), then adding 4 levels for the obliterated serial number (R. 48 at 6 ¶ 23), but I found those enhancements flawed as applied here. The base level was increased due to defendant's prior drug trafficking cases, both of which appeared to be low-level, non-violent matters. Defendant did not have prior crimes of violence on his record, nor prior firearm convictions. In sum, he did not appear to pose a greater risk with a gun than other felons. See United States v. Fogle, 694 F. Supp. 2d 1014, 1017-18 (E.D. Wis. 2010). The obliterated serious number enhancement applied on a strict liability basis, as the record contained no evidence that defendant removed the number, directed that it be removed, or even knew it had been. See United States v. Jordan, 740 F. Supp. 2d 1013, 1016-17 (E.D. Wis. 2010).

Second, I did not see a need for a guideline term to protect the public or deter. While defendant had a fairly substantial prior record, as indicated, he did not have prior crimes of violence or firearm convictions on his record; his prior drug cases were low level and non-violent. Further, he had served just one previous prison sentence, 2 years concurrent on the 2003 drug trafficking and bail jumping matters. The guidelines scored these cases separately, although they were related factually and the sentences served together. I also took into account the length of the prior sentence in deciding how much time was needed for specific deterrence. Generally, a lesser period of imprisonment is required to deter a defendant not

12

previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend. See United States v. Qualls, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005). As indicated, defendant had not served more than 24 months in the past; while a longer term was warranted in this case, it was not necessary to multiply it several times. Finally, I took into account that defendant was nearing 40, an age when recidivism rates decline, and that his more serious prior convictions were older.

For all of these reasons, I concluded that a 30 month sentence, as recommended by the defense, sufficed to satisfy the purposes of sentencing.

In the instant motion, defendant notes that the parties and the court were not at the original sentencing aware of how serious the COVID-19 crisis would become; had that been known, the recommendations and the sentence may have been different. (R. 49 at 19; R. 53 at 2.) Defendant further notes that he is not seeking to reduce the overall sentence but simply to serve more of it in the community. (R. 49 at 19.) He indicates that he has about a year left to serve (and will be halfway house eligible in about nine months); that he has a stable residence to go to, where he can safely shelter in place; that he has a strong support system in the community; and that he has skills that will permit him to gain employment. (R. 49 at 7, 19; R. 53 at 2, 12.) Finally, defendant argues that his release will not pose a danger to the community: he completed his last term of supervision; he is 39 years old, with a significant work history (R. 49 at 19; R. 53 at 15); his prior convictions are older (R. 53 at 12-13); and the instant offense was non-violent (R. 53 at 15). Conditions of supervision, including home confinement, would ameliorate any risk he may pose. (R. 49 at 20.)

I conclude that the sentence should remain as fixed. I considered defendant's arguments about his age, prior record, and the nature of the offense in setting the original term.

13

While the guideline range somewhat overstated the risk he posed, he does have a fairly significant prior record, which demonstrates some disrespect for the law. His record does not include prior firearm convictions or "crimes of violence," but it does include domestic abuse related matters, he was subject to a domestic violence injunction when he possessed the gun at issue here, and the Oklahoma case involved possession of a firearm. Shortening the term would fail to give any weight to these factors. It would also result in a prison sentence shorter than his previous prison term, impairing the specific deterrent effect.

Defendant states that he completed his last term of supervision, but as discussed above he violated his conditions in that case by using drugs and absconding. Defendant also relies on his work skills and support system in the community, but he seemed rather aimless during the time preceding his arrest in this case; he admitted at the original proceeding that he did not make much effort to work after losing his welding job in 2016. These factors do not support a modification of the sentence.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's motion (R. 49) is denied.

Dated at Milwaukee, Wisconsin, this 28th day of May, 2020.

s/ Lynn Adelman
LYNN ADELMAN
District Judge

14